# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **Michael J. Stapleton,** | Civil No. 09-3322 (MJD/JJG) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Michael Astrue,** | |
| Defendant. | |

JEANNE J. GRAHAM, United States Magistrate Judge

This litigation comes before the undersigned on the parties' cross motions for summary judgment (Doc. Nos. 9, 16). Jennifer G. Mrozik, Esq., represents plaintiff Michael Stapleton. Lonnie F. Bryan, Assistant United States Attorney, represents defendant Michael Astrue, who appears in his capacity as Commissioner of the Social Security Administration. The motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636(b) and Local Rule 72.1(a).

Mr. Stapleton applied for disability benefits from the Social Security Administration (the SSA) on November 13, 2006. He claimed disability as a result of depression, bipolar disorder, and attention deficit hyperactivity disorder (ADHD). After the SSA denied his application initially and upon reconsideration, Mr. Stapleton obtained a hearing before an Administrative Law Judge (ALJ). In a decision on January 8, 2009, the ALJ ruled that Mr. Stapleton was not disabled and denied benefits.

Mr. Stapleton then commenced this action for judicial review, arguing that the ALJ made unsupported findings about whether his impairments were severe enough, under SSA regulations, to constitute a disability. The parties now bring cross-motions for summary judgment.

I. BACKGROUND

A. Prior to the Application: February 2002 to November 2006

For most of his career, Mr. Stapleton (Stapleton) worked as a psychologist. After reports of misconduct, however, the Minnesota Board of Psychology suspended his license in February 2002. (*See* Tr. at 166, 174.) His license evidently was reinstated in 2004, but in any event, the prior suspension limited employment opportunities for Stapleton in the field of psychology. (*See* Tr. at 211.) Stapleton was working in 2006, but the record does not say whether he was working in psychology or treating patients. (*See* Tr. at 204, 211.)

At the time, Stapleton was receiving treatment from a psychiatrist, Dr. Anil Sipahimalani; and a psychotherapist, Dr. Thomas Vance. Dr. Sipahimalani previously diagnosed Stapleton with ADHD and a mild form of bipolar disorder, which were managed through psychiatric medications and sessions with Dr. Vance. In an exam note from a visit on July 21, 2006, Dr. Sipahimalani found that Stapleton was generally doing well. (*See* Tr. at 204, 211-12, 228, 231.)

When Stapleton visited Dr. Sipahimalani on November 3, 2006, he reported that he had just lost his job because "he couldn't keep up with paperwork." Stapleton said that he was applying for other jobs, and moreover, he was resuming therapy with Dr. Vance. (Tr. at 225.) Shortly thereafter, on November 13, 2006, Stapleton filed his application for Social Security disability benefits.

### B. From Filing to Reconsideration: November 2006 to June 2007

Stapleton resumed therapy with Dr. Vance in late November 2006 and visited him several times in the ensuing months. Dr. Vance chiefly diagnosed Stapleton with depression. (*See, e.g.,* Tr. at 199-201.) In their discussions during these visits, one common theme was the grief Stapleton expressed over the loss of his professional identity as a psychologist. (Tr. at 196-98, 200.) The record elsewhere suggests that, due to his prior suspension, Stapleton could not obtain insurance coverage for his practice. (Tr. at 220.)

Notwithstanding these professional issues, Dr. Vance consistently urged Stapleton to pursue other employment. For instance, in an exam note on November 28, 2006, Dr. Vance indicated that he encouraged Stapleton "to consider possibilities of work." (Tr. at 201.) And in an exam note on January 25, 2007, Dr. Vance observed,

> Mike [Stapleton] has come a long way yet still struggles with professional contact with psychotherapy/profession . . . . Disc[ussed] alternative prof[essions]—importance of looking ahead & entertaining new professions/identities etc.

(Tr. at 197.) Stapleton also told Dr. Vance, at a visit on February 8, 2007, that he was going to a job interview the next day. (Tr. at 196.)

In the meantime, at a visit to Dr. Sipahimalani on December 29, 2006, Stapleton reported that "he feels he's unable to work at present" and was unable to overcome problems with depression and inability to concentrate. (Tr. at 223.) That same day, Dr. Sipahimalni prepared a statement for Stapleton's private disability insurer, finding that Stapleton was completely unable to work for an indefinite period. (Tr. at 315.)

At their following visit on February 28, 2007, Dr. Sipahimalani did not note significant changes. (*See* Tr. at 216.) But he prepared another statement for Stapleton's private insurer, and

this time he determined that Stapleton was "partially unable to work" because of anxiety, depression, and impaired concentration. (Tr. at 314.)

Stapleton was interviewed by various Social Security officials, regarding his application for disability benefits, in March 2007. During these interviews, Stapleton stated that he suffered from ADHD, depression, and bipolar disorder. (Tr. at 105.) When asked about daily activities, Stapleton said that he maintained personal hygiene, light housekeeping, and financial affairs. He frequently golfed, and he also reported social visits with friends and family, as well as frequent attendance at Alcoholics Anonymous meetings. (Tr. at 113-17.)

A consulting forensic psychologist, Sharon Fredericksen, examined Stapleton's mental health records and completed a report on April 4, 2007. She found that Stapleton suffered from mild depression, and also noted "one mention of possible bipolar [disorder] but no recent mania." Dr. Fredericksen opined that Stapleton had mild restrictions in daily living, mild to moderate difficulties in social functioning, and moderate difficulties with concentration, persistence, and pace. (Tr. at 247-48.)

The SSA initially denied Stapleton's claim on April 5, 2007. When Stapleton sought reconsideration, the SSA collected some more information about his claim in June 2007, but this information did not materially depart from what Stapleton had disclosed in March 2007. (*See* Tr. at 136-46.) The SSA denied the claim on reconsideration on June 26, 2007. (Tr. at 55, 63, 66.) Stapleton then requested a hearing before an ALJ, which for reasons not disclosed by the record, did not occur until January 2009.

### C. Awaiting the Hearing before the ALJ: June 2007 to January 2009

During continuing treatment with Dr. Vance, Stapleton frequently discussed his prospects for employment. (*See, e.g.,* Tr. at 264, 266.) Like Dr. Sipahimalani had done beforehand, Dr.

Vance also prepared certain statements for Stapleton's private disability insurer. In a statement on April 12, 2007, Dr. Vance opined that Stapleton "should not [be] working in his previous field of employment"; in another statement on July 9, 2007, Dr. Vance determined that Stapleton was completely unable to work "at his profession" and added, "In his professional field he is unable to work." (Tr. at 311, 313.)

At a visit on May 24, 2007, Dr. Vance suggested that Stapleton "take three months off" from seeking employment. (Tr. at 262.) But shortly thereafter, Dr. Vance again encouraged Stapleton to look for work. During a visit on July 5, 2007, Dr. Vance suggested that Stapleton consider part-time work. (Tr. at 398.)

Stapleton then commenced a job search in earnest, and at a visit on October 31, 2007, he told Dr. Vance that he had interviewed for six jobs in the previous week. (Tr. at 392.) Then on November 5, 2007, Stapleton accepted an employee counseling position with a large company. (*See* Tr. at 27-28, 391.) With these positive developments, Stapleton told his mental health providers that he was feeling better. (*See* Tr. at 341, 391-92.)

Stapleton lost his job, however, in January 2008. In exam notes from a visit on January 23, 2008, Dr. Vance indicated,

> [Stapleton] was fired from his job bec[ause] he was too inappropriate with a female follow employee, making jokes that were offending to her. He was dismissed after one previous warning. . . . Believes he should have known that he was being too much clowning around[.]

(Tr. at 390.)

After this setback, Stapleton reported that his depression had worsened. (Tr. at 341, 389.) But Dr. Vance still urged Stapleton to be active, and during visits on February 28, 2008 and

5

March 20, 2008, Dr. Vance suggested that Stapleton either find work or a volunteer position. (Tr. at 385-86.)

Stapleton also renewed his efforts to lodge a claim with his private disability insurer. For this process, Stapleton obtained further statements from his mental health treatment team. In one statement on February 7, 2008, Dr. Vance indicated that due to "significant depressive episodes," Stapleton was "unable to work in his profession." (Tr. at 309.) By comparison, Dr. Sipahimalani prepared a statement on February 20, 2008 saying that, because of depression, mood swings, and impaired concentration, Stapleton was unable to work at all. (Tr. at 308.)

The record does not reveal any significant changes in the remainder of 2008. Stapleton continued to visit Dr. Vance about once every three weeks, and Dr. Sipahimalani about once every two months. He reported depression, and in some instances, mildly manic symptoms. (*See, e.g.,* Tr. at 333, 378.) During the summer, he often golfed, and he did some landscaping work for his sister. (Tr. at 28, 377, 379.) When visiting Dr. Vance later that year, Stapleton reported that his depression was getting worse, and that he sometimes had difficulty getting out of bed or staying abreast of light housekeeping. (Tr. at 375, 377.)

At the behest of Stapleton's counsel, Dr. Vance completed a mental health assessment form on January 5, 2009. Dr. Vance stated that Stapleton faced significant difficulty with following rules or instructions, or in behaving predictably and appropriately in social situations. And Dr. Vance further determined that Stapleton was essentially incapable of interacting with supervisors or authority figures. (Tr. at 411-12.)

### D. Proceedings before the ALJ

The hearing before the ALJ took place on January 8, 2009. Stapleton testified that he was having problems maintaining housekeeping or personal hygiene, and that he would have difficulty handling jobs with even minimal social contact. (Tr. at 31, 41-42.)

In the subsequent decision of March 25, 2009, the ALJ initially found that Stapleton had ADHD, depression, and bipolar disorder. (Tr. at 15.) Among other questions, the ALJ considered whether the impairments met certain regulatory criteria, under which the impairments would be deemed a disability for the purpose of qualifying for SSA disability benefits.

For the affective mental health disorders asserted by Stapleton, these regulations include a requirement that the claimant demonstrate certain functional limitations, under what are called "B criteria." The claimant must show at least two of the following: (1) marked restrictions in daily living activities; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation. 20 C.F.R. § 404 subp. J, Appx. 12.04. The ALJ evaluated each of these criteria in turn.

Regarding daily living activities, the ALJ found that Stapleton lived independently, keeping his own household and maintaining personal finances, so he only faced mild restrictions in this area. (Tr. at 16.)

On social functioning, the ALJ noted that Stapleton had some problems, such as irritability and inappropriate comments. But the ALJ otherwise observed that Stapleton was generally cordial and cooperative in his relationships with medical professionals, and that he maintained contacts with his friends and family, as well as Alcoholics Anonymous. As a result, the ALJ concluded that Stapleton only had moderate restrictions upon his social functioning. (*Id.*)

Regarding concentration, persistence, and pace, the ALJ noted that there were claims of impaired attention or concentration. The ALJ then observed that the treating professionals had not measured the extent to which these impairments inhibited Stapleton from working. And the ALJ cited other evidence showing that Stapleton could maintain reasonable concentration, including his reliability recounting his medical history and his ability to live independently. As a result, the ALJ found only moderate restrictions upon concentration, persistence, and pace. (*Id.*)

The ALJ found no evidence that Stapleton had suffered any episodes of decompensation, and therefore, the ALJ concluded that there were no restrictions of this sort. (*Id.*)

Based on the preceding evaluation of the B criteria, the ALJ determined that Stapleton was not disabled under the regulatory listings, and ultimately denied benefits. (Tr. at 16, 22.) Stapleton pursued an administrative appeal within the SSA, which was denied, and then he commenced his current action for judicial review. (*See* Tr. at 1, 6.)

## II. ANALYSIS

### A. Standard of Review

Stapleton chiefly argues that, when the ALJ found that the B criteria were not satisfied, those findings were not supported by substantial evidence. In particular, Stapleton contends the ALJ improperly discounted the opinions of his treating professionals, and rather than discounting these opinions, the ALJ should have solicited more information from the treating professionals. The Commissioner counters that there is substantial evidence for the ALJ to have concluded that Stapleton did not meet the B criteria.

On review of the decision of an ALJ regarding social security benefits, a court examines whether the findings of the ALJ are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). Substantial

evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quotation omitted).

When assessing whether there is substantial evidence, a court must consider evidence that supports, and that which contradicts, the factual findings of the ALJ. *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004). Those findings are not subject to reversal just because substantial evidence may also support another outcome. If it is possible to draw differing conclusions from the record, but one of those conclusions supports the findings by the ALJ, those findings must be affirmed. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

### B. Evidence from Treating Professionals

Stapleton contends that, if the opinions from Dr. Vance are given proper weight, they compel a finding that he met at least two of the B criteria. He places particular emphasis on the January 5, 2009 report, where Dr. Vance found that Stapleton had substantial difficulty handling instructions or social situations, and that Stapleton was unable to interact with supervisors at all.

#### 1. Assessing the Weight of the Evidence

The rule is that opinions from a treating or examining professional are usually entitled to substantial weight. But such opinions do not have conclusive weight, and they must be supported by acceptable clinical or diagnostic data. *Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).

There are several scenarios where an ALJ may properly give less weight to the opinion of a treating physician. For instance, the opinion may receive less weight where it is contradicted by the physician's own findings elsewhere in the record, *Gonzales v. Barnhart*, 465 F.3d 890, 896 (8th Cir. 2006), or by other evidence of the claimant's activities, *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

9

Although the January 5 report supports a finding that Stapleton satisfied some B criteria, there was ample reason for the ALJ to give that report less weight and make contrary findings. This point is best illustrated by the second and third B criteria: whether Stapleton had marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, and pace.

In the January 5 report, Dr. Vance found that Stapleton had serious difficulties with social functioning and could not interact with supervisors. Yet the record elsewhere shows that Stapleton had cordial relationships with his mental health treatment team, and that he maintained social contacts with friends and family. For that matter, Stapleton had sufficient social aptitude to obtain multiple job interviews in October 2007 and gain employment in November 2007, even though he lost that job shortly thereafter.

More importantly, throughout the course of therapy, Dr. Vance repeatedly urged Stapleton to look for work. And in the statements that Dr. Vance made to Stapleton's private disability insurers, Dr. Vance did not find that Stapleton was entirely unable to work, only that he was "unable to work in his profession." Such statements contradict Dr. Vance's ensuing assessment, in the January 5 report, that Stapleton could not handle relationships with coworkers or supervisors.

On concentration, persistence, and pace, the analysis is similar. Dr. Vance sometimes determined that Stapleton had impaired concentration. Nonetheless, Dr. Vance never measured the severity of this impairment. And because Dr. Vance otherwise counseled Stapleton to get a job, the ALJ could reasonably infer that this impaired concentration was not severe enough to preclude employment. Just as significantly, Stapleton was not fired in January 2008 for inattention or inefficiency, but instead for his inappropriate conduct.

For the remaining B criteria, there is reasonable evidence to support the conclusion that Stapleton could manage daily living activities, and there is no evidence suggesting that Stapleton suffered from episodes of decompensation.[1] Considering the record in its entirety, the ALJ had substantial evidence to conclude that Stapleton did not satisfy the B criteria, and therefore, that his impairments did not constitute a disability under the regulatory listings.

## 2. Obligation to Solicit Clarification

Perhaps due to the contradictions in Dr. Vance's own opinions, Stapleton argues that where a treating professional issues an opinion contrary to his or her own treatment notes, the ALJ has an obligation to contact the professional and seek clarification. In support of this position, Stapleton cites Social Security Ruling 96-5p (1996), which states,

> [O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

Consistent with this ruling, an ALJ sometimes has an obligation to seek clarification from treating professionals, especially where a critical issue is ambiguous or undeveloped. But where an ALJ has found that a treating professional's opinion is unreliable or contradictory, rather than unclear, the ALJ has no obligation to solicit additional information. *Samons v. Astrue*, 497 F.3d 813, 819 (8th Cir. 2007); *Britton v. Astrue*, 622 F.Supp.2d 771, 776-77 (D.Minn. 2008).

---

[1] During certain visits to Dr. Vance, Stapleton reported that he was golfing up to seven times a week and sometimes characterized this behavior as obsessive or compulsive. When examining the B criteria, the ALJ did not consider whether this behavior had adverse affects, and Stapleton now argues that the ALJ misunderstood the significance of this problem.

Assuming for the sake of argument that Stapleton was golfing compulsively, his mental health providers did not examine this particular issue, nor did they evaluate whether it caused functional limitations within the scope of the B criteria. For these reasons, Stapleton's allegedly unhealthy golfing behavior does not influence the analysis here.

Turning to the current litigation, the record reveals some contradictions between Dr. Vance's January 5 report and his notes and opinions elsewhere. But these inconsistencies go to the weight and reliability of his opinion. There is no indication that Dr. Vance was ambiguous, or that the basis for his opinion was unclear. For these reasons, the ALJ did not have any obligation to seek clarification from Dr. Vance, and so this issue does not affect the outcome here.

### C. Opinions from Non-Treating Professionals

Stapleton further contends that the ALJ gave undue weight to the opinions of non-treating professionals. As a general rule, the opinions of non-treating professionals receive less weight than those of treating professionals. *Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008). Because there is little or no contact with the claimant, the opinion of a non-treating professional cannot, by itself, supply substantial evidence about the claimant's impairments. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

There is no indication that the ALJ placed undue emphasis on opinions of non-treating professionals. To the contrary, the record shows that when considering the B criteria, the ALJ drew reasonable conclusions from the records of Stapleton's treating professionals. Any purported concerns about the opinions of non-treating professionals, therefore, are immaterial.

## III. CONCLUSION

Stapleton argues that the ALJ did not have substantial evidence to find that the B criteria were not satisfied. In particular, Stapleton contends that the ALJ did not have cause to discount a report from Dr. Vance, his treating psychologist. Based on the inconsistencies between that report and other evidence, however, the ALJ could give that report less weight. And when the record is considered in its entirety, the ALJ could reasonably determine that the B criteria were not met.

This Court concludes that, because there is substantial evidence in support of the ALJ's decision, that decision should be upheld and the parties' motions for summary judgment should be decided accordingly. Being duly advised of the all files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Stapleton's motion for summary judgment (Doc. No. 9) be **DENIED.**

2. The Commissioner's motion for summary judgment (Doc. No. 16) be **GRANTED.**

3. This litigation be **DISMISSED WITH PREJUDICE.**

Dated this 7th day of October, 2010.    /s    *Jeanne J. Graham*

JEANNE J. GRAHAM
United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **October 21, 2010**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge then shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.